# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:18CR281 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| SHAWN FORD, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Defendants, Shawn Ford ("Ford") and Charles Rogers ("Rogers"), seek suppression of all evidence seized from a Chevy Equinox and statements made by them during an encounter with police on March 27, 2018. (Doc. No. 25 ["Ford Mot. Vehicle/Arrest"]; Doc. No. 28 ["Rogers Mot. Vehicle/Arrest"].) Ford also seeks suppression of all evidence seized by police from his residence on April 19, 2018. (Doc. No. 26 ["Ford Res. Search"].) The government opposes the motions. (Doc. No. 36 (Omnibus Response ["Opp'n"]).) The Court conducted an evidentiary hearing on issues relating to the search of Ford's residence on December 19, 2018. The search of the Chevy Equinox and the statements made to law enforcement were the subject of an evidentiary hearing on January 31, 2019, February 1, 2019, and April 12, 2019. At the conclusion of the April 12, 2019 hearing, the Court took the matters under advisement and permitted counsel to file post-hearing briefs. (Doc. No. 64 (Ford Supplemental Brief ["Ford Suppl."]); Doc. No. 65 (Government Supplemental Brief ["Gov't Suppl."]); and Doc. No. 66 (Rogers Supplemental Brief ["Rogers Suppl."]).)

## I. MOTIONS TO SUPPRESS VEHICLE SEARCH AND STATEMENTS

### A. Background

Ford and Rogers were arrested on March 27, 2018. The arrests followed a string of robberies and attempted robberies of Metro PCS cellular phone stores (between March 21, 2018 and March 27, 2018) in Cleveland, Ohio in what is designated by the Cleveland Police Department ("CPD") as the Third District. In each robbery two men, wearing masks and blue latex gloves and brandishing guns, entered the store and demanded money and other items from employees and customers before leaving in a vehicle. In the last robbery— at approximately 7:40 pm on March 27, 2018—an off-duty police officer was one of the customers in the store at the time. After the men took the cash from the register, as well as the cash on the person of the off-duty officer, they ran out of the store. The off-duty officer gave chase, identified himself as a police officer, and ordered them to stop. The suspects ran to a parked vehicle and one suspect fired on the officer, who fired back.

CPD Patrolman Schmitz testified at the hearing on January 31, 2019.  He testified that he was patrolling CPD's Fourth District on March 27, 2018 when he heard a broadcast over the police radio channel he was monitoring that two black men wearing dark colored clothing had just robbed a Metro PCS store. The radio message further provided that an off-duty police officer had exchanged gunfire with the suspects before the two men fled in an older model gold or tan mid-size SUV resembling a Chevy Equinox.[1] At 8:00 pm, within 20 minutes of the robbery,

---

[1] Witness reports varied as to the description of the vehicle used in the March 27, 2018 robbery. The description offered by the off-duty officer witness—a gold or tan Chevy Equinox—was the only description broadcasted to officers in the Fourth District.

Officer Schmitz observed a gold-colored Chevy SUV heading southbound onto Kingsbury Boulevard, approximately 3 miles from the Metro PCS store. As the vehicle drove past him, he noticed what appeared to be fresh bullet marks on the driver-side door. He followed and ran the plates and determined that the owner, Savannah Young, had an invalid registration. The vehicle eventually parked legally on the street and the three occupants—Rogers, Ford, and Gloria Rosario—exited and began to walk away from the vehicle. Officer Schmitz approached the individuals in his zone car and, through the driver-side window, initiated a conversation with them. Much of what transpired in what became a very fluid scene was captured by the body cameras of Officer Schmitz, Detective Cramer, and Sargent Worsencroft, of which segments of these recordings were played at the hearings. Officer Schmitz immediately advised the trio that a vehicle matching the description of the car they had just exited was reported to have been involved in a crime, and he was following up on that report. The officer then directed the three to place their hands on the hood of his zone car. Within minutes, other officers including Detective Cramer arrived on the scene, and the three individuals were patted down for weapons and other dangerous instrumentalities.

Officer Schmitz began to get background identification information from Rogers, and Detective Cramer redirected Ford to stand in front of his zone car before he obtained background information from Ford. Rogers did not have any identification on his person and initially indicated that his name was Robert Rogers, when in fact, that was his brother's name. Rogers also advised Officer Schmitz that he was high on "Molly," an illegal controlled substance that produces hallucinations. Rogers informed the officer that he had been driving the Equinox, and that he believed that it belonged to Gloria Rosario. While Rosario indicated that the Equinox

3

belonged to her, a run on the license plate revealed that she had no ownership interest in the vehicle, and that it belonged to Savannah Young, though her registration was listed as "Not Valid." Rogers stated that he did not know Young.

Sargent Mark Worsencroft, an officer with the Fourth District, testified at the April 12, 2019 hearing. He responded to the scene because one of his officers—Officer Schmitz—had initiated a stop. Upon arrival, Sgt. Worsencroft became the ranking officer on the scene and his role was primarily supervisory. He did speak with several individuals who were standing on the porch of the house that was closest to the stopped vehicle. One woman informed him that the Equinox had been parked in front of the house the entire day, a fact that was inconsistent with Officer Schmitz's observations regarding the vehicle on Fuller Avenue moments before he initiated the stop. Sgt. Worsencroft also spoke with a man on the porch, who informed the Sargent that he wanted to beat up one of the male suspects, eventually explaining that he had previously exchanged hearted words with one of the two men.

Meanwhile, Officer Schmitz ran the name "Robert Rogers" though his computer in his zone car and was advised by dispatch that Robert Rogers had outstanding warrants and an expired license. Officer Schmitz questioned Rogers further about his identity and his age because his stated date of birth did not correspond with the identity of Robert Rogers. Still believing him to be Robert Rogers, Officer Schmitz handcuffed Rogers and told him that there was a warrant for his arrest. He asked Rogers why he was wearing a jacket and no coat to which he responded that he just came out of the house and put on his coat. Officer Schmitz received further information from dispatch that Robert Rogers may be related to Charles Rogers and, upon further questioning by Officer Difranco as to his identity, Rogers eventually admitted that he was

Charles Rogers. At this point, Officer DiFranco had to start over and run the information regarding Rogers' identity through dispatch to confirm identity and check for warrants. Dispatch subsequently informed officers on the scene that Rogers did not have any outstanding warrants. Rogers was read his *Miranda* rights at 8:47 pm.

Detective Cramer also testified, and portions of his body camera were played in court. Ford provided Detective Cramer with accurate information relating to his date of birth, age, and identity. Detective Cramer asked Ford where he was coming from and he indicated that he had come from home, that he only knew Rogers as "Chucky," and that he had just been released from prison for robbing a girl. He told Detective Cramer that Rosario and Rogers simply showed up at his residence and offered him a ride. Like Rogers, he did not have any identification on his person. Detective Cramer told Ford he was being detained but that he was not under arrest. He was handcuffed and placed in Detective Cramer's zone car.[2] In the vehicle, Ford is heard to admit that he does not know either Rogers or Rosario well. Ford asks why he is being detained, and Detective Cramer advises him that once he confirms Ford's basic information he will "get [him] on [his] way."

Over the next 30 minutes, other officers arrive on the scene. Officer Schmitz assures Rogers that if he does not need to take him in on an outstanding warrant, he will be released. Rogers tells the officer that he does not have a valid license and that he has an expired temporary permit. Meanwhile, Detective Cramer was tasked with running both Ford and Rogers through the CPD's warrant center on Channel 9 to determine whether the two men had outstanding warrants

---

[2] During this time, it was determined that the third individual—Gloria Rosario—had outstanding arrest warrants. She was taken into custody and removed from the scene.

in other courts. He testified at the hearing that he delayed in running this secondary search because he was aware that officers from the Third District and homicide[3]—who were assigned to investigate the robberies—were still arriving on scene, so there was time.

The off-duty officer who witnessed the last robbery also arrived on the scene. He was directed to the zone cars containing Ford and Rogers to perform a "cold stand," whereby he observed each defendant to determine if he could identify either man as one of the robbery suspects. Officer Schmitz testified that he subsequently learned that the off-duty officer was unable to identify either man.

The body cameras then show Officer Schmitz and several other offers on scene in conversation in the street. Officer Schmitz explains that the ranking officer on scene, Sgt. Worsencroft, had instructed him to "cite and send" Rogers, meaning that he will be issued a citation for driving with an invalid license.[4] Because there was insufficient evidence to hold either man for suspicion of robbery, Officer Schmitz further explains that both men would be released. Because the vehicle's owner was not on scene, Officer Schmitz determined that the vehicle would be towed and that an inventory would be completed incident to the tow.[5] However, the inventory search revealed a cardboard box with a plastic bag containing a white powdery substance believed to be crack cocaine. Upon this discovery, Rogers and Ford were

---

[3] Because the robberies occurred in the Third District, officers from this district were assigned to investigate. Additionally, because the last robbery involved a police shooting, the homicide unit also participated in the investigation.

[4] The record reveals that Officer Schmitz actually wrote two citations. The first citation was written to "Robert Rogers" for driving with an expired license. The second citation was written to "Charles Rogers" for failing to renew his temporary permit.

[5] Sgt. Worsencroft's testimony, as well as his body cameras played at the April 12, 2019 hearing, confirmed that he had instructed his officers to "hook" (or tow) the car because neither Ford nor Rogers had a valid driver's license and to "kick" (or release) Ford and Rogers after citing Rogers for operating a vehicle without a valid license.

arrested for possession of drugs, and the inventory search was suspended because it was determined that vehicle would be searched incident to arrest. Rogers was also arrested for obstructing official business by giving false identification information. After Ford was *Mirandized*, Ford stated that the car wasn't his, he was at home when Rogers picked him up, and he did not know anything about the suspected drugs. The time from the initial stop to defendants' arrests was approximately one hour. The white powdery substance was eventually determined not to be cocaine.[6]

While it was not the focus of the hearings, it is undisputed that Ford was eventually transported to the homicide unit where he was interviewed by Detectives Lynch and Borden after being *Mirandized*. Ford denied any involvement in the robbery or shooting and denied any knowledge of the drugs. He admitted that his DNA would be found on the blue latex gloves found in the Equinox, explaining that, because he is on parole, he always checks a vehicle for drugs or guns. Rogers was also transported to the homicide unit where he was separately interviewed by Officers Tassin and Difranco, following the receipt of *Miranda* warnings. He also denied involvement in the robbery and shooting, but admitted that he had driven the Equinox and had picked up Ford and Rosario. He further disavowed any knowledge regarding any of the items found in the Equinox.

---

[6] Officer Schmitz and Detective Cramer both testified that the CPD does not do field testing of suspected narcotics due to the cost and danger to officers in handling foreign substances.

### B.    Standing and the Inventory Search

The parties agreed that the Court would first address the question of whether defendants had standing to challenge the search of the vehicle which led to their arrest. After receiving evidence and argument relative to the standing issue, the Court announced its ruling that neither defendant had standing to challenge the vehicle search. While the Court placed its reasons on the record, it is necessary to revisit those reasons briefly, as they impact the Court's treatment of the vehicle search.

A defendant cannot demonstrate standing to challenge a police search unless he can show he had a legitimate expectation of privacy in the place to be search; here, the Chevy Equinox. *Rakas v. Illinois*, 439 U.S. 128, 138-48, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). The burden of proving a reasonable expectation of privacy is on the proponent of the motion to suppress. *Id*. at 130-31 n.1; *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988). In determining whether standing to challenge a vehicle search exists, courts have looked to numerous factors, including ownership, possession and/or control, historical use of the vehicle, the existence of a subjective expectation of privacy, and whether the circumstances, as a whole, would support an objective expectation. *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991).

Of the factors identified in *Sanchez*, Rogers had at least temporary possession of the vehicle. Rogers claimed he was driving the car, and Ford presented no evidence to the contrary. Further, Detective Cramer's body camera showed Rogers placing the keys to the Equinox on the hood of Officer Schmitz' zone car. While Rosario claimed to be the vehicle's owner, officers

discovered that the vehicle actually belonged to Young, an individual Rogers did not even know. Rogers did not otherwise assert an interest in the vehicle or its contents. The Court found that, based on these facts, casual control of the vehicle on this one occasion did not supply the necessary reasonable expectation of privacy. *See United States v. Taylor*, 496 F. Supp. 2d 852, 855-57 (S.D. Ohio 2006) ("Where proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest."); *see, e.g., Sanchez*, 943 F.2d at 114 (rejecting standing on similar facts and noting that "[h]ad Sanchez demonstrated a more intimate relationship with the car's owner or a history of regular use," he might have been able to demonstrate a reasonable expectation of privacy).

The Court determined that Ford's standing argument stood on even shakier ground, as he offered no proof that he was even the driver of the vehicle. Further, after he was properly *Mirandized*, body camera footage reveals that Ford waived his right to remain silent and specifically disavowed any ownership in the car or its contents. He further admitted that the vehicle did not belong to Rosario, and that he thought it might belong to someone named Savannah Young, but he was not certain. Based on these factual circumstances, the Court found that Ford also lacked a legitimate expectation of privacy. *See, e.g., United States v. Parendes-Lima*, 493 F. Supp. 2d 958, 963  (S.D. Ohio 2005) (passengers in van, with no ownership interest, lacked standing to challenge search); *see also United States v. Davis*, 430 F.3d 345, 359-60 (6th Cir. 2005) (no standing to challenge search of vehicle where defendant disavowed any association with the evidence recovered from the car).

The record reflects that the Chevy Equinox was initially searched in order to create an

inventory prior to towing it from the scene, and that the decision to arrest the defendants was not made until after the inventory search revealed the presence of suspected narcotics. "One recognized exception to the warrant requirement permits law enforcement officers to conduct inventory searches, including the contents of closed containers, so long as they do so pursuant to standardized procedures." *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007). "Inventory procedures serve three strong governmental interests: [1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen or vandalized property, and [3] to guard the police from danger." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (quotation marks and citation omitted); *see Tackett*, 486 F.3d at 232. An inventory search must be conducted in good faith, "not as a pretext for criminal investigation." *Tackett*, 486 F.3d at 232. "However, the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007).

Officer Schmitz testified that he decided to institute an inventory search of the vehicle, after it was determined that the vehicle would be towed, because there was no one on scene who could take possession of the vehicle. As previously noted, Rosario was going to be taken into custody on outstanding warrants, Ford did not have his driver's license or any other form of identification with him, and Rogers admitted to being on narcotics and did not have a valid license. Additionally, the registration for Savannah Young, to whom the car bellowed, was "not valid." Without someone to which he could release the car, Officer Schmitz testified that he believed that the police were obligated to impound it and search it to produce an inventory, in accordance with the CPD's Tow or Release Policy.

The body cameras support the government's position that the officers proceeded with an inventory search. Officer Schmitz is heard discussing with other officers on the scene that there is not enough to hold the defendants for the robberies. He explains to the other officers that the sergeant in charge had instructed him to "cite and send" Rogers (issue him a citation for driving on an invalid license and release him) and "hook" the Equinox (tow the vehicle). The officers are then heard discussing the details regarding the tow and the need for an inventory incident to the tow. It is not until the suspected drugs are discovered that the decision to arrest defendants is made.

Defendants offer a number of arguments attacking the search under the inventory exception. But because they lack standing, they may not challenge any aspect of the decision to search incident to a tow or the CPD's adherence to its internal release or tow policy.[7] Rather, as the Court noted at the hearing, defendants' only avenue for relief lies in their ability to challenge the constitutionality of their stop and detention. *See United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (While a passenger in a vehicle could not challenge the driver's consent to search the vehicle, he could challenge his own stop and detention and argue that any evidence found in the

---

[7] Even if this avenue was available to defendants, the Court would have found that failure to strictly comply with the letter of the internal release or tow policy would not justify suppression. While the government has the burden of demonstrating that the search was conducted pursuant to standardized procedures, *United States v. Richards*, 147 F. Supp. 2d 786, 789 (E.D. Mich. 2001)*; see also Col. v. Bertine*, 479 U.S. 367, 373, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987), technical violations do not justify suppression. *Mundy*, 621 F.3d at 287 (rejecting argument that inventory search was pretextual because no inventory report was generated, the court observed that "[a]lthough compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable") (quotation marks and citation omitted); *see United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant [that] it was not an inventory search."); *see also United States v. Lopez*, 547 F.3d 364, 370-71 (2d Cir. 2008) (failure to create a complete list of all inventoried items did not invalidate search, distinguishing case from a search that strayed beyond the *scope* permitted by a policy). The fact remains that the officers on scene were confronted with a situation wherein neither the owner nor the passengers of the vehicle were legally permitted to drive the vehicle. Under these circumstances, it was reasonable for the officers to believe that they could not leave the vehicle unattended on a city street.

11

vehicle "should be suppressed as fruits of illegal activity"); *see, e.g., United States v. Oliver*, No. 3:09-CR-00144, 2012 WL 2601948, at *3 (W.D. Ky. July 5, 2012) (Lacking standing to challenge a vehicle's search, the court found that the passenger's "only avenue to contest the [vehicle] search is to challenge the constitutionality of his stop and seizure while inside the [vehicle]").

### C.  Stop, Detention, and Statements

Ford and Rogers argue that their arrests based solely upon the discovery of an unstated quantity of suspected, not actual, cocaine were illegal. They insist that officers lacked reasonable suspicion to stop and detain them, that the police impermissibly extended their detention, and that all statements made by them and all evidence seized from them or the vehicle must be suppressed as fruits of illegal police activity under *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). Ford further argues that any statements he made before he was *Mirandized* must be suppressed because they were procured through an impermissible custodial interrogation. The Court takes each argument in turn.

#### 1.  The Initial Investigatory Stop

An officer may conduct an investigatory stop with "'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Place*, 462 U.S. 696, 702, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)). "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)). Rather, the officer must have a "reasonable suspicion" of criminal activity based on "specific and articulable facts[.]" *Terry v. Ohio*, 392

U.S. 1, 21, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Still, "[w]hile an officer making a *Terry* stop must have more than a hunch, 'reasonable suspicion' is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *Sokolow*, 490 U.S. at 7).

The Court finds that Officer Schmitz had reasonable suspicion to conduct an investigatory stop. Defendants had just been seen exiting a vehicle that matched the description of a vehicle used in a robbery—a late model gold or tan SUV resembling a Chevy Equinox. The vehicle was observed approximately twenty minutes after the robbery in a location that was only a few miles from the robbery. Additionally, the vehicle appeared to have fresh bullet marks, which was consistent with reports that an off-duty officer, a witness to the robbery, had exchanged gun fire with the robbery suspects. Based upon the totality of the circumstances known to Officer Schmitz, the Court finds that there was reasonable suspicion to initiate a *Terry* stop of defendants. *See United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008) (courts determine existence of reasonable suspicion from totality of the circumstances); *see, e.g., United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007) (applying similar facts to find reasonable suspicion to stop vehicle suspected to have been used in a burglary); *United States v. Craig*, 198 F. App'x 459, 562-63 (6th Cir. 2006) (officer had reasonable suspicion to justify investigatory stop at the time he asked driver of parked vehicle for his identification, where officer had seen driver get out of car matching the description of car that had just fled the scene of a robbery); *Hurst*, 228 F.3d at 756-57 (reasonable suspicion to initiate a stop of defendant where car "roughly matching" the defendant's car had been reported traveling away from scene of burglarized residence).

2.    *The Continued Detention*

Police activities during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008) (quotation marks and citation omitted). During the investigatory stop, police may ask questions or request documents to establish a person's identity and to confirm or dispel suspicions of criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). But "[t]he Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions." *United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005) (noting that a constitutional initial stop can "become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances") (quotation marks and citation omitted). "Simply put, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

Defendants argue that officers impermissibly extended the duration of the investigatory stop. In support, they highlight the fact that Detective Cramer delayed in preforming a final warrants check through Channel 9 because he knew that Third District and homicide officers and investigators, as well as the off-duty officer witness, had yet to arrive on scene. Defendants argue that Detective Cramer intentionally continued the stop after he had determined defendants' identity so that he could continue the robbery investigation. The argument is misguided because the robbery investigation *was* the purpose of the stop.

The reasonableness of scope and length of the stop is dictated by "the circumstances

14

which justified the interference in the first place." *Terry*, 392 U.S. at 20. "While the brevity of an investigative detention is an important factor in determining whether the detention is unreasonable, courts must also consider the purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685. "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*. at 686. Defendants were not stopped because an officer witnessed a traffic violation. Instead, Officer Schmitz was clear that defendants were stopped because their vehicle matched the description of a vehicle used in a robbery. It was reasonable to wait for officers from the Third District and the homicide unit to arrive, as they were investigating the robberies. It was also appropriate to delay so that the off-duty officer witness could arrive on scene and perform a cold stand. In fact, it is clear from the body cameras that, following these events, officers were prepared to release defendants. Here, officers diligently pursued their investigation into whether the vehicle had been used in the robbery, and the hour it took to coordinate between various law enforcement officers was not unreasonable.[8] Defendants' motions to suppress evidence as fruits of an illegal stop and detention are DENIED.

---

[8] The Court notes that the investigatory stop was partially frustrated, and unnecessarily delayed, by Rogers' decision to provide false identity information, advising officers that he was his brother, Robert. The officers were sidetracked confirming the validity of the outstanding warrants on Robert. The fact that other witnesses were providing conflicting stories regarding the location of the vehicle, as well as the tension between the man on the porch and one of the defendants, also contributed to the delays in the investigation.

### 3.     *Custodial Statements*

Defendants also assert that all statements made before they received their *Miranda* warnings should be suppressed as arising out of an impermissible custodial interrogation. They maintain that they were "in custody" and being interrogated the moment they were directed to place their hands on the hood of Officer Schmitz' zone car. The government argues that defendants were not in custody and that questions posed by the officers were basic questions to obtain identity, and that neither defendant was questioned about the robberies. It concludes, therefore, that no *Miranda* warning was necessary. Finally, the government emphasizes that, while defendants were eventually handcuffed and placed in separate zone cars, "they were repeatedly told they were not under arrest and were only being detained while an investigation occurred." (Opp'n at 277.)

To determine whether an individual is in custody for purposes of receiving *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person would have interpreted the situation. *Stansbury v. California*, 511 U.S. 318, 322-23, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). In other words, would a reasonable individual in the same position as the defendant have felt free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). When a police interrogation crosses over from an investigatory stop to a custodial interrogation, *Miranda* warnings must be given before the suspect can be questioned. The Sixth Circuit relies on several factors in determining whether an individual is in custody, including: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody, such as

whether the suspect was informed at the time of the questioning that he was free to leave, whether the suspect possessed unrestrained freedom of movement during questioning, and whether the suspect initiated contact with the police. *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

*Miranda* warnings are not required unless the suspect is being interrogated. Interrogation is defined as either express questioning or its functional equivalent, which includes words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). In the absence of a custodial interrogation, the requirement to recite *Miranda* warnings is not triggered and the analysis ends. *See United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (citing, among authority, *Miranda*, 384 U.S. at 444). As previously noted, officers may ask a detainee a moderate number of question to determine an individual's identity and to confirm or dispel the officer's suspicion. *Id*.

Defendants underscore the fact that Office Schmitz testified that, while defendants had their hands on his car, they were not free to leave and that he would have been stopped had they attempted to do so. But the very nature of a *Terry* stop means that a detainee is not free to leave during the interrogation. *See Swanson*, 351 F.3d at 528 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-41, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). Here, the initial questioning took place outside in a public space with other agents and members of the public present, and officers limited their questioning to the identities of the individuals, the identity of the vehicle's driver and owner, and where the three had been and were going. Defendants were not in custody at this point and the questioning was well within the scope of a legitimate investigatory stop. *See*

17

*Berkemer*, 468 U.S. at 439 (basic questions to obtain an individual's identity and from where he was coming did not amount to interrogation); *Woods*, 711 F.3d at 740-41 (reflexive questions attendant to the stop were not interrogatory); *see, e.g., Swanson*, 341 F.3d at 529-31 (no custodial interrogation under circumstances similar to the present case).

Arguably, the questioning moved closer to a custodial interrogation as the events unfolded and defendants were handcuffed and placed in separate zone cars. Even then, however, officers repeatedly told defendants that they were not under arrest and that they would be released if they did not have any existing warrants. This factor weighs against finding a custodial setting. *See Swanson*, 341 F.3d at 530 (noting that "a statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was 'in custody'") (citing *Salvo*, 133 F.3d at 948); *but see United States v. Bailey*, 743 F.3d 322, 341-42 (2d Cir. 2014) (noting that "telling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as when he is unrestrained"); *see also United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991) ("When the agents placed [the defendant] in the back of the police car, they went beyond the bounds of *Terry*. Placing [the defendant] in the police cruiser not only constituted a seizure . . . but also crossed the line into an arrest. [The defendant] was moved from his car to another location, and his freedom of movement was severely restricted.")

Ultimately, the issue of whether defendants were in custody is academic as the questions posed by the officers on scene never progressed beyond basic questions targeted at defendants' identities and their relationship to the vehicle. The undisputed facts demonstrate that defendants were not asked *any* questions about the robberies. No questions were posed that were likely to

elicit an incriminating response, and, accordingly, no *Miranda* warnings were necessary.[9] Defendants' motions to suppress all statements made as a result of custodial interrogation are DENIED.

## II. MOTION TO SUPPRESS EVIDENCE FROM RESIDENCE SEARCH

### A.      Background

Defendant Ford also seeks to suppress all evidence seized from his residence at 3331 E. 112th Street, Cleveland, Ohio, on April 19, 2018. The residence was a two story, two family dwelling. Ford challenges the search of the upstairs of the home on the ground that the warrant that issued was based on stale information. He challenges the search of the downstairs portion of the home on the ground that his grandmother lacked the authority to consent to the search.

Following their arrests on March 27, 2018, defendants were held in the Cuyahoga County Jail. During the course of the robbery investigation, Detective Lesette Gonzalez began listening to the calls made by both defendants from the county jail. On April 16, 2018, Detective Gonzalez received a DVD recording of jail calls from the county prosecutor. On that same day (April 16, 2018), Detective Gonzalez listened to the April 2, 2018 call to "Cellbug." On April 19, 2018,

---

[9] In his supplemental brief, Ford argues that the alleged taint from his arrest renders any statements he later made at the homicide unit, after he was *Mirandized* for a second time, inadmissible. Because his arrest was lawful, the argument fails. Even if the arrest had been unlawful, however, the undisputed delay between the arrest and the questioning by different officers at the station served as a sufficient buffer to insulate the later police station interrogation. *See, e.g., United States v. Blevins*, 755 F.3d 312, 327 (5th Cir. 2014) (sufficient delay when unwarned statement were given at defendant's residence and subsequent interrogation occurred at police station); *United States v. Williams*, 681 F.3d 35, 44-45 (2d Cir. 2012) (sufficient delay or changed circumstances though same officers involved in both interviews where 2 hours had elapsed); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006) (*Miranda* warnings effective when initial questions were brief and spontaneous, second interrogation provided significant new information, interrogations were conducted at two distinct locations, and interrogators did not refer back to initial interrogation); *see also Oregon v. Elstad*, 470 U.S. 298, 313, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (Whether an admission obtained through coerced confession taints a second confession depends upon considerations such as the passage of time, the change in place of the interrogations, and the change in identity of the investigators); *United States v. Pacheco-Lopez*, 531 F.3d 420, 429 (6th Cir. 2008).

based upon Ford's request that Cellbug remove or destroy potential evidence in the residence, Gonzalez sought a search warrant for Ford's residence. Based upon post office records indicating that Ford resided in the upstairs unit, Detective Gonzalez drafted a warrant for the upstairs unit. The warrant described the property to be sought as "[c]lothing, firearms and ammunition, money, cell phones, credit cards, state IDs, EBT cards, purses, wallets, and/or any and all evidence pertaining" to state law robberies. (Doc. No. 36-2 (Affidavit for Search Warrant) at 300.) The warrant was signed and executed that same day. A search of the upstairs unit revealed the following: a blue latex glove (like the ones used by the assailants in the robberies) (found in the basement) and a black hoodie with white strings.[10]

### B.    Stale Evidence

Ford argues that the warrant was based on stale evidence because officers conducted the search 17 days after his phone call suggesting that he was planning to dispose of incriminating evidence. Given his instructions to "Cellbug" to dispose of the clothing and "everything" "ASAP," Ford suggests that the delay rendered the warrant stale. The government counters that the information is not stale because officers executed the warrant within days of first learning of the April 2, 2018 phone call on April 16, 2018.

While the government's argument may appropriately support a good faith argument under *Leon*, it does not inform the staleness inquiry, as this inquiry is not concerned with how quickly the officers acted. Instead, "'the critical question is whether the information contained in

---

[10] It is unclear whether the hoodie was found in connection with the warrant search of the upstairs or the consent search of the downstairs unit. The government lists it as a fruit of both searches.

the affidavit, when presented to the [magistrate] judge, established that there was a fair probability that [evidence] would still be found at [the location of the search.]'" *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "[T]he length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *Id.* (quotation marks omitted).

Whether the information is stale depends on the "inherent nature of the crime," *Spikes*, 158 F.3d at 923, and is "tailored to the specific circumstances in each case." *Abboud*, 438 F.3d at 572. Factors relevant to consider in evaluating the question of staleness include: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be search searched (mere criminal forum of convenience or secure operation base?), etc." *Id.* at 572-73 (numerals omitted); *see United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (identifying same factors).

Applying these factors to the instant case—and recognizing the deferential standard the Court must apply in reviewing the probable cause determination of the municipal judge—the information was not stale. As to the first factor, the nature of the robberies was such that they were not random impulsive acts but crimes that required planning and coordination between two assailants. Second, the warrant describes Ford as residing at the residence to be searched, as confirmed by post office records. In other words, he was entrenched, not nomadic. *See Abboud*, 438 F.3d at 572. Third, the items to be seized—clothing and guns—were of a durable nature and not perishable like drugs. *See, e.g., United States v. Crews*, 502 F.3d 1130, 1140 (6th Cir. 2007)

21

(12-day delay between foot chase with defendant and search for weapons did render information in warrant stale); *United States v. Lancaster*, 145 F. App'x 508, 513 (6th Cir. 2005) (2-year delay between information and search of property for guns did not render information stale); *United States v. Jefferson*, 717 F. Supp. 2d 790, 802 (S.D. Ohio 2010) (17-day delay in executing search of residence after homicide not render information stale where seeking clothing and other DNA evidence). Finally, it was likely that the items sought would still be at a private residence. *See, e.g.*, *Jefferson*, 717 F. Supp. 2d at 802 (evidence of a crime still likely to be at residence 17 days after the commission of the crime). Because the relevant factors weigh in favor of finding that the evidence was not stale, Ford's motion to suppress the fruits of the upstairs search is DENIED.

### C.    Consent

With respect to the search of the downstairs unit, Ford questions his grandmother's capacity to provide consent. Through her efforts to verify Ford's address, Detective Gonzalez came across some information that suggested Ford may have actually resided in the downstairs unit of 331 E. 112th Street. Based on this information, she decided that she would secure consent to search the downstairs unit. Once at the residence, Broderick Steward, a resident of the building, informed Detective Gonzalez that his wife owned the whole house. He advised officers that he and his wife and son stayed in the upstairs unit, and that his stepson, Shawn Ford, lived in the downstairs unit, but that Ford had access to the whole house. Steward also advised that his step mother-in-law (Ford's grandmother), Marcella Berry, also stayed in the downstairs unit but was presently helping out some other family members. He told officers that Berry had a key. Detective Gonzalez attempted to get consent from Steward to search the downstairs, but he

ultimately indicated that he did not feel comfortable giving it because Berry's property was in the downstairs unit. After one or more unsuccessful attempts to reach Berry by phone, Berry appeared at the residence.

When asked by detectives if she lived at the residence, she answered "yes and no." She explained that she had not stayed there since September or October of 2017, but she came to the house on a regular basis and kept property (including plants to which she regularly tended) in the house. She also advised officers that she was in the process of "owning" the house and that she had just put new locks on some doors. After Berry orally consented to a search of the downstairs, she signed the written consent form. She then produced the keys to the door, entered the unit with officers, and even watered the plants. A search of the downstairs unit revealed black jogging pants and white Nike sneakers size 12.

Ford argues that Berry lacked the ability to give valid consent because she did not "reside, inhabit or occupy the premises at the time of the search[.]" The government disagrees, and further argues that, even if Berry lacked actual authority to consent, she had apparent authority.

In *United States v. Gillis*, 358 F.3d 386, 390-91 (6th Cir. 2004), the Sixth Circuit discussed the contours of the voluntary consent exception to Fourth Amendment warrant requirement. There the court held:

> [T]he prohibition [on warrantless searches] does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). Common authority is not to be implied by a mere property interest in the property, but from 'mutual use . . . by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 172 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The burden of establishing that a third party

possesses common authority to consent to a search rests with the state. *Rodriguez*, 497 U.S. at 181, 110 S. Ct. 2793. Even if a third party does not possess actual common authority over the area that was searched, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search. *Id*. at 188-89, 110 S. Ct. 2793. Apparent authority is judged by an objective standard. *Id*. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.

*Id*. "Authority to consent to a search rests on 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that their number might permit the common area to be searched.'" *United States v. McGee*, 564 F.3d 136, 139 (6th Cir. 2009). The question of apparent authority inquires whether the "police could reasonably conclude that the party consenting to the search *lived* at the premises." *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005) (emphasis in original).

The totality of the facts known to the officers supports a reasonable conclusion that, at a minimum, Berry had apparent authority to consent. There was evidence that Berry had, at various times, resided in the unit, kept property there, maintained plants on the premises, and had exercised control over the premises by recently changing the locks. *See United States v. Penney*, 576 F.3d 297, 308 (6th Cir. 2009) (fact that girlfriend told officers she took care of Penney's chickens when defendant was not there established apparent authority); *Hudson*, 405 F.3d at 442 (fact that girlfriend was romantically involved with defendant, lived with defendant and their child, and had a key sufficient for apparent authority). Her familiarity with the premises and its contents was evident from the video, as she is seen easily navigating her way through the various rooms in a manner consistent with someone who has lived there. Further, the fact that Berry's

cohabitation of the property was not uninterrupted does not serve as a bar to finding apparent authority. *Id*. For example, in *Gillis,* a girlfriend was found to have apparent authority even though she told the officers that she had left defendant's residence several months earlier because of physical abuse and did not have all of the keys to the place where she also said she continued to reside at the premises and had been there earlier that same morning. *Gillis*, 358 F.3d at 389-91. Similarly, here, Berry responded to the question, "Do you live here?" with a "yes and no" response and then explained that she continued to keep property in and exercise control over the property and had a key to the premises. *See United States v. Grayer*, 232 F. App'x 446, 449 (6th Cir. 2007) (live-in girlfriend had apparent authority where her personal effects were in the room and she had knowledge of the other contents of the room).

Because the Court finds that Berry had, at a minimum, apparent authority to consent to a search of the downstairs unit, Ford's motion to suppress the fruits of that search is DENIED.

### III. CONCLUSION

For the foregoing reasons, as well as the reasons set forth on the record, the motions of defendants Ford and Rogers to suppress are DENIED in full.

**IT IS SO ORDERED**.


Dated: May 13, 2019                      _____
                                          **HONORABLE SARA LIOI**
                                          **UNITED STATES DISTRICT JUDGE**